## Ex parte VER PAULT.
### No. 48.

Circuit Court of Appeals, Second Circuit.
Nov. 2, 1936.

**114**

George Foster, Jr., of New York City, for appellant.

Lamar Hardy, U. S. Atty., of New York City (Malcolm A. Crusius, Asst. U. S. Atty., of New York City, of counsel), for respondent.

Before MANTON, L. HAND, and SWAN, Circuit Judges.

SWAN, Circuit Judge.

Thomas Ver Pault, a boy of fifteen, arrived from Ireland on the S. S. Samaria on November 27, 1935, and sought admission as the son of a native-born citizen, Alfred Ver Pault. Before a Board of Special Inquiry the relatrix testified that she was an alien and the applicant was her son, born at sea when she was returning from the United States to Ireland in January, 1920; that his father was Alfred Ver Pault, to whom she was never married. The boy was excluded from admission on the ground that he was a quota immigrant without an immigration visa, and this decision was affirmed by the Board of Review. Thereafter affidavits were submitted in support of the claim that the applicant's father and mother had contracted a common law marriage in the state of New York in 1918. The case was reopened and new evidence submitted. But the Board of Special Inquiry decided the issue against the applicant and again ordered his exclusion; and again its decision was affirmed by the Board of Review. This writ of habeas corpus was then sued out by the mother on behalf of her son upon the ground that the hearing was unfair and the Board's decision arbitrary and unsupportable.

As the District Judge pointed out, there was substantial evidence to support the finding that no common-law marriage was contracted by the applicant's parents. The findings of the administrative tribunals are conclusive if supported by any evidence; the court is not to weigh the evidence pro and con. United States ex rel. Shore v. Corsi (C.C.A.) 61 F.(2d) 761; Kwock Jan Fat v. White, 253 U.S. 454, 457, 40 S.Ct. 566, 64 L.Ed. 1010. Hence the contention that the excluding decision was so arbitrary and unsupportable as to justify judicial intervention must fail.

More may be said in favor of the contention that the hearing was unfair. It is urged that the Board displayed a hostile bias to the claim of marriage and did not question the father in respect to vital points on which he might have corroborated the testimony of the applicant's mother. In brief summary the mother's story was as follows: In the autumn of 1918 Alfred Ver Pault proposed marriage without a church ceremony because, he said, being in the army he had to keep the marriage secret. She was a young Irish girl, seventeen or eighteen years old, who had been in this country about a year. He told her the marriage would be just as legal as if a priest officiated and she believed him. He gave her a wedding ring and took furnished rooms in which they lived as hus-

band and wife for some two months. To their landlords, to friends, and to relatives they represented that they were married. After she became pregnant, he left her. When she explained the situation to her sister, she was told that without a marriage certificate she could not be legally married. Believing this, she returned to Ireland under her maiden name. Her son was born on shipboard. At her mother's home in Ireland she adopted the name of Mary Ver Pault "to hide her shame." She subsequently returned to the United States under her maiden name and in 1935 her son sought admission. When he was excluded after the first hearing, she consulted an attorney, and he advised, after hearing her story, that she and Ver Pault had contracted a valid common-law marriage. On many points her story was corroborated by the testimony of the McGees, the Mulvaneys, and Alfred Ver Pault himself. But on the very crux of the matter, namely, the terms upon which the parties had mutually agreed to live together, Ver Pault was not questioned at all. He was asked whether he was married to the boy's mother, and replied that he was not "legally married" because "we weren't married in church or in city hall." He admitted that he promised to marry her, had lived with her for two months in furnished rooms, and had represented to her sister and to friends of hers that she was his wife. He explained that these representations were made in order to enable them to spend the night together at the homes of her sister and of friends named Mulvaney. He also said that at the time he did not know what a common-law marriage was. From his testimony it may be inferred that he did not intend to enter into a contract of marriage per verba in præsenti. But his secret intention or his supposition as to what the law required to constitute a legal marriage is not controlling, for it is the reasonable meaning to the promisee of the promisor's expression of intention which is determinative in law as to a contract of marriage as well as to any other civil contract. Bissell v. Bissell, 55 Barb. (N.Y.) 325; Imboden v. St. Louis Union Trust Co., 111 Mo.App. 220, 86 S.W. 263; Farley v. Farley, 94 Ala. 501, 10 So. 646, 33 Am.St.Rep. 141. See Bishop, Marriage & Divorce, §§ 327, 334. Upon facts quite similar to those appearing in the case at bar, the New York court said in the Bissell Case, supra, 55 Barb. 325, at page 331: "If this be so, there is no reason why the defendant should not be held to the consequences of his acts; and if, while endeavoring to accomplish a seduction, he has blundered into matrimony, he has no one but himself to blame." Therefore what Ver Pault said and did at the time when the relatrix contends a contract of marriage was made is what the Board of Special Inquiry should have sought to ascertain. Yet he was asked nothing about this; nothing concerning her statement that he told her the marriage would be legal without an officiating priest; nothing with respect to giving her a wedding ring or what significance he intended it to have. Had he been interrogated on these matters it is not impossible that he might have corroborated the mother's testimony on what was the very essence of the case; but, in any event, any fair search for the truth required that these matters be inquired into.

It must be remembered that under the Rules of the Department an applicant for admission is not allowed to be represented by an attorney at the examination which the Board of Special Inquiry conducts, and the Board's findings of fact, if supported by any evidence, are conclusive upon the courts. Hence it is of peculiar importance that the facts upon which the alien's rights depend be fairly investigated by the examining inspectors. Since the applicant's mother had not asserted at the first hearing the existence of a common-law marriage, it was natural that the claim should be viewed with skepticism when advanced later. That it was so viewed is most plainly apparent from the final inquiry addressed to the husband: "Will you please tell us who invented this common law marriage business in this case?" But we do not rest our decision upon the view that the Board members acted with conscious bias or from a predetermination that the mother's story was false. Rather, we think that they labored under a misapprehension of the law and supposed that Ver Pault's secret intention not to contract a marriage would control regardless of what intent he may have expressed to the woman. If the hearing was conducted in a bona fide effort to ascertain the truth, such an error of law is the only possible explanation of the failure to interrogate him regarding his acts and words on the occasion which she asserted constituted a present contract of marriage. We believe that an error of law which precludes investigation of the essential facts, makes the hearing unfair and justifies judicial intervention no less than does a mistake of law which results in

an erroneous decision. That mistakes of the latter sort may be corrected is well established. Gegiow v. Uhl, 239 U.S. 3, 9, 36 S. Ct. 2, 60 L.Ed. 114; Lloyd Sabaudo Societa v. Elting, 287 U.S. 329, 335, 53 S.Ct. 167, 77 L.Ed. 341. Nor are cases lacking which have held a hearing unfair because of a failure on the part of the examining inspectors to require the production of additional pertinent evidence. See United States ex rel. Basile v. Curran, 298 F. 951 (D.C.S.D. N.Y.); United States ex rel. Zaffarano v. Corsi, 63 F.(2d) 757 (C.C.A.2). Accordingly, we think the writ of habeas corpus should not have been dismissed but that the applicant for admission should have been remanded to the custody of the immigration officials to await their decision after a new hearing which should be seasonably accorded him and in which Ver Pault's words and acts should be fully inquired into. That the court has the power to make such a disposition is clear. Tod v. Waldman, 266 U.S. 113, 45 S.Ct. 85, 69 L. Ed. 195; United States ex rel. Zaffarano v. Corsi, supra; United States ex rel. Friedman v. Tod, 296 F. 888 (C.C.A.2).

The order is reversed, and the cause remanded for further proceedings in conformity with this opinion.