UNITED STATES ex rel. Sebastian VERMIGLIO, Appellant,

v.

James W. BUTTERFIELD, District Director, Immigration and Naturalization Service, Appellee.

No. 12347.

United States Court of Appeals Sixth Circuit.

June 9, 1955.

Henry P. Onrich, James G. Mackey, Detroit, Mich., for appellant.

Dwight K. Hamborsky, Asst. U. S. Atty., Detroit, Mich. (Fred W. Kaess, U. S. Atty., Detroit, Mich., on the brief), for appellee.

Before SIMONS, Chief Judge, and ALLEN and MARTIN, Circuit Judges.

MARTIN, Circuit Judge.

An attorney, Henry P. Onrich, on behalf of his client Sebastian Vermiglio,

filed in the United States District Court for the Eastern District of Michigan a petition for writ of habeas corpus in which he averred that Vermiglio was imprisoned by James W. Butterfield, District Director of Immigration and Naturalization at Detroit, Michigan, under a warrant of deportation. The petition further charged Vermiglio's detention to be unlawful because the hearing accorded him, resulting in his being ordered deported, had been unfair for the following enumerated reasons: (1) that the hearing was held in Chicago, which is located in a different judicial district than that in which Detroit, the home city of Vermiglio, is situated; (2) that in consequence of this, Vermiglio was unable to present witnesses who would have "counteracted" the evidence introduced at the hearing; (3) that, because of "the distance involved and the resulting expenses," Vermiglio was unable properly to defend himself at the hearing in Chicago; (4) that the hearing was held under the McCarran Act, averred to be unconstitutional; and (5) that the immigration authorities were acting in an arbitrary and capricious manner in ordering Vermiglio deported, although they knew that he had pending applications for pardon with the Pardon Attorney of the Department of Justice of the United States and with the office of the Governor of Michigan and that the pardons, if granted, would nullify the outstanding deportation order.

Pursuant to the prayer of the petition, the habeas corpus writ was issued. As ordered, the respondent District Director of Immigration brought Vermiglio into the United States District Court at Detroit on July 27, 1954, at which time three attorneys appeared for the relator. The district director was represented by the United States Attorney. An extended colloquy ensued between the contending attorneys and the court concerning the proper procedure and the issues presented. Further hearing of the cause was set for August 4, 1954, and an adjournment was taken until that date.

Through the United States Attorney, the respondent district director filed, on July 30, 1954, a comprehensive answer and return to the petition for writ of habeas corpus. Attorney Onrich, for the relator, filed on August 3, 1954, a traverse to respondent's answer wherein it was prayed that writ of habeas corpus be granted and that an order be issued rescinding and suspending the deportation of Vermiglio previously promulgated by the Immigration and Naturalization Service.

On August 4, 1954, the hearing of the cause was renewed in open court, with Vermiglio present. He was represented by the same three attorneys, and an Assistant United States Attorney appeared as attorney for the District Director of Immigration. Further elaborate colloquy between court and counsel transpired, following which Vermiglio took the stand as a witness in his own behalf. He was examined by his attorney and cross-examined by the Assistant United States Attorney. The government attorney introduced in evidence a complete record of the deportation hearings and all administrative proceedings in relation to Vermiglio which had resulted in the order for his deportation. The material portions of this record had been made available to attorneys for Vermiglio prior to the hearings in the United States District Court.

The relevant facts revealed by the record will be reviewed, necessarily at some length, to present the full picture. Vermiglio was arrested in Chicago on December 10, 1953, under a warrant issued by the United States Immigration and Naturalization Service in that city. The warrant charged that he is an alien in the United States in violation of section 241(a)(11) of the Immigration and Nationality Act, in that he has been convicted of violating laws relating to illicit traffic in narcotic drugs, 8 U.S.C.A. § 1251(a) (11), and also that he is in this country in violation of section 241(a) (4) of the same Act, in that he has been convicted of crimes involving moral tur-

pitude, 8 U.S.C.A. § 1251(a) (4). A hearing on these charges scheduled at Chicago for December 22, 1953, was, at the request of an attorney for Vermiglio, adjourned to January 4, 1954, at which time the hearing was had before a special inquiry officer. The government called appellant as an adverse witness. He swore that his parents were dead; that he had received information about his birth from his mother and other relatives; and that he was born in Detroit, Michigan, on May 13, 1912.

He admitted and the records proved that he had been convicted of the following listed five crimes with resultant sentences: 1. Breaking and entering a store at nighttime. (On guilty plea, sentenced by Recorder's Court of Detroit on December 27, 1934, to 7 years and 6 months' imprisonment.) 2. Conspiracy to violate Harrison Anti-Narcotic Act, as amended, 26 U.S.C.A. §§ 2550 et seq., 3220 et seq. (On guilty plea, sentenced on November 5, 1932, by United States District Court at Detroit to thirteen months' imprisonment.) 3. Automobile theft. (On guilty plea, sentenced on October 24, 1929, by state district court at Omaha, Nebraska, to one-to-three years' imprisonment.) 4. Unlawfully transferring counterfeited sugar ration documents. (On guilty plea, sentenced on March 18, 1947, to imprisonment for one year and fined $1,000.) 5. Unlawfully possessing counterfeited obligations of the United States. (On guilty plea, sentenced on March 18, 1947, to two years' imprisonment, to run consecutively to the one-year sentence for sugar-ration violation imposed on the same date.)

The government established by an alien registration form and application for certificate of identification of Vermiglio's mother, Maria Marino, that she had arrived in the United States on January 20, 1920, aboard the Steamship Regina Italia. The manifest record introduced in evidence showed that she and her children, Sebastiano (age 6), Pietro, Vincenza, and Lauria, had arrived on the named ship and had been admitted into the United States on that date; and that she and her children had never been in the United States before. It is obvious that "Sebastiano" was the Italian name for appellant, "Sebastian" Vermiglio.

The government introduced a certificate on a Department of Justice form containing information taken from entries in the original manifest relating to Sebastiano Marino, showing that he entered the United States on January 20, 1920, on the Steamship Regina D'Italia, at the age of 6 years; that he was a citizen of Italy, born in "Valestrata" in that country; and that he was accompanied by his mother, Maria, and his brothers and sister mentioned above. Public school records of Sebastian Vermiglio at Detroit, Michigan, showed that he and his parents were born either in Italy or in Sicily.

A certificate of arrival filed by appellant's brother, Andrew Vermiglio, was introduced in evidence and showed that Andrew came to the United States on January 20, 1920, from "Balastrate," Italy, and that he had been accompanied by his mother and his brothers, Sebastiano, Pietro, and Vincenzo, and his sister, Graza. A similar application by appellant's brother, Pietro, or Peter, introduced in evidence, corroborated some of the foregoing facts.

An important document introduced by the government was a certified copy of a birth certificate, written in Italian and authenticated by a United States Consul. A certified translation of this document disclosed that Sebastiano Vermiglio was born on June 8, 1913, at "Balestrate," in the Province of Palermo, and that he was the son of Vincenzo and Graza Marino. The Chief Probation Officer of Recorder's Court in Detroit testified that a probation report showed that appellant had stated that he was born on May 13, 1911, in Italy; that his father was dead, but that his mother, Grace, was living in Detroit; and that his brothers were Andrew, Peter and James, and his sister was named "Grace." The parole officer and record clerk of the Men's Reformatory at Lincoln, Nebraska, brought into evidence a record of appellant's convic-

tion under the name of "Samuel Rocco" in Nebraska in 1930. A document signed by appellant while in that reformatory stated that he was born on January 25, 1912, at "Balastrate" in Sicily.

Appellant testified that he was baptized in Chicago, Illinois, and that the baptism could have taken place at St. Philip Benize Church in that city. Father Giambastiani, pastor of St. Philip's since 1916, was introduced as a witness and testified that he had had custody of the baptismal register continuously, except for about a month and a half in the latter part of 1952 during which period the book had disappeared. It was later mysteriously returned by being left on the doorstep of the rectory. He brought the register with him. It covered the period from August 8, 1911, to May 18, 1913. The priest asserted that an attorney for appellant had asked him to change the church baptismal record concerning Sebastian Vermiglio by naming the City of Detroit as his birthplace. In response, the priest advised the attorney to furnish affidavits of two persons who knew that appellant had been born in Detroit. He stated that, after receiving such affidavits from the lawyer at a later date, he directed that the word "Detroit" be added to the baptismal record concerning Vermiglio. He testified further, that the name of Sebastiano Vermiglio, both in the index of the register and on the page thereof recording appellant's birth, had been tampered with. A secretary of the church testified that, on the order of Father Giambastiani, she had added the birthplace "Detroit, Michigan," to the baptismal record of Sebastian Vermiglio. She said that she had prepared the certificate of his baptism which was introduced in evidence at the deportation hearing.

A documentary expert of the scientific detention laboratory of the Chicago Police Department testified that he had examined the baptismal register in question, as well as its index. By use of violet ray and low power miscoscope, he found that the documents had been tampered with. There had been an erasure of one name and the substitution therefor of the name "Vermiglio Sebastiano." An investigator of the United States Immigration and Naturalization Service brought in a sworn statement of appellant, given on August 1, 1952, at St. Louis. This statement contained contradictory statements made by appellant, and thus reflected upon his credibility.

After the hearing on February 5, 1954, appellant's attorney requested adjournment until March 10, 1954. The request was granted and, upon resumption of the hearing on the last-mentioned date, appellant testified that his attorney, Henry Onrich, had made inquiries at various dioceses concerning appellant's baptismal record. Copies of some of these letters of inquiry were introduced in evidence.

The deportation hearing was finished on March 10, 1954, and early in April the special inquiry officer reported in a lengthy review his conclusions that appellant is an alien and is deportable on the charges made in the warrant of arrest. An appeal was taken by appellant to the Board of Immigration Appeals at Washington; and, on January 9, 1954, the matter was argued before that tribunal. Appellant was represented there by an attorney named Hyman Margolies, who admitted that he was not satisfied that the baptismal record in evidence established the birth of appellant. He said that, as far as he was concerned, the alien had not proved that he was born in the United States and that the only thing he could advise the alien and his attorney to do would be to try to obtain a pardon of some of his crimes and thereby to be enabled "to throw the warrant out." When questioned directly as to whether he conceded alienage on the part of appellant, attorney Margolies replied: "As it now stands, I concede it." The attorney requested the board to allow further time for the attempt to be made to secure such pardons and to procure evidence from a priest in Canada who might be able to substantiate the claim of Vermiglio that he had been born in the United States. After examining the decision of the special inquiry officer,

however, the board denied the motion to reopen the proceedings.

With the knowledge and approval of the Chicago immigration authorities, appellant moved from Chicago to Detroit around March 21, 1954, following which the appellee, on July 12, 1954, issued the warrant for appellant's deportation from the United States. Some eleven days later, appellant's attorney filed a motion with District Director Butterfield requesting a stay of deportation, for the stated reason that an application for presidential pardon on behalf of appellant was pending. This request was immediately denied.

In response to instructions, appellant reported on July 27, 1954, at the office of the United States Immigration and Naturalization Service in Detroit and was taken into custody. On the same date, a petition for habeas corpus was filed on his behalf by attorney Henry P. Onrich. In due course, appellant's attorney was informed by the acting pardon attorney of the Department of Justice of the United States that the application of appellant for pardon had been filed and that no further action thereon was contemplated.

This completes a review of what we consider to be the material facts and documentary evidence adduced at the hearings before the immigration authorities. We have heretofore outlined the proceedings in the district court on the hearings of the application for writ of habeas corpus. The attorney for appellant, Lionel Austin, conceded that the appropriate limit of the hearing in the district court was to decide whether the appellant, Vermiglio, had received a fair hearing on the proceedings for deportation.

■ There was certainly no showing made that the immigration authorities acted arbitrarily or capriciously. Appellant was represented by competent counsel constantly during the hearings. It is not shown that, during the Chicago hearing, appellant or any of his attorneys asked for a transfer to Detroit or to any other district. Nor is there any showing that appellant was in any way prevented from presenting witnesses at the Chicago hearing or that he was put to any great expense as a consequence of the distance between Detroit and Chicago. Appellant was staying in Chicago when he surrendered, pursuant to the warrant of arrest. He stated that he desired to produce only two witnesses at the hearing: one of whom, Mrs. Saputo, he thought but was not sure, lived in Boston; the other desired witness, Mr. Saputo, lived in Detroit but appellant did not know his address in that city. Vermiglio said that he intended to prove that Mr. and Mrs. Saputo "saw me born." This was all he expected to prove by them. The affidavits of these witnesses had been received in evidence at the administrative hearing in Chicago. If the fact that the Saputos were not present in person at the hearing was of any consequence, it was more damaging to the government than to appellant for the reason that, as affiants, they had not been subjected to cross-examination.

After the final hearing on August 4, 1954, at which Vermiglio testified, the district judge stated that he found that the relator did have a fair hearing; he found no showing that Vermiglio was unable to produce in Chicago the witnesses he wanted, or that he was financially unable to produce the two witnesses. The judge further found the record to show that Vermiglio was represented by counsel; and that neither the relator nor his attorneys, during the progress of the hearing, had requested a transfer to another district. The judge repeated that he found as a matter of fact that the relator did have a fair hearing before the immigration and deportation officers.

The judge then invited the lawyers for appellant to argue the other grounds of their petition. Attorney Austin asserted that the immigration authorities had acted in an arbitrary and capricious manner, in hurrying "this man's deportation while he had pending two petitions for pardon." The Assistant United States Attorney made an effective rejoinder; and, after lengthy discussion and collo-

quy, the judge announced his findings and conclusions. He stated: "I think I can dispose of this matter now: I do find that the Relator had a fair hearing on proceedings for deportation. There is nothing before the court to indicate that he did not have a fair hearing. Furthermore, there has been no pardon granted here, either by the Governor of the State of Michigan or the President of the United States, pardoning the Relator as to any of the offenses charged in the warrant of deportation. There are applications pending now.

"Under the Immigration Act, as to crimes involving moral turpitude, which are set forth in support of deportation under Sec. 241–A(4) of the Immigration and Nationality Act, there seems to be procedure for staying deportation pending the decision on the application for pardon. There does not seem to be a similar provision for staying deportation as to an application for pardon for the narcotic law violation.

"I do not think it is the province of this Court, on a hearing of a petition for habeas corpus, and a consideration of the habeas corpus proceedings, to stay the decision of this matter pending action by the Governor or the President on these pardon applications. There is nothing to indicate how long that might take. In any event, there have been no pardons granted by either the Governor or the President, as to any of these crimes. I will go one step further: I do not know whether it would make any difference in the outcome of this matter to reconsider it by another court. But it is the decision of this Court that the issuance of a presidential pardon as to the narcotic law violation does not affect deportability under Sec. 241–A(11) of the Immigration and Nationality Act. Therefore, the petition will be dismissed and the writ denied."

We are in thorough accord with the denial by the district judge of the writ of habeas corpus, but we find it unnecessary to take the "one step further" which he did and to decide whether a presidential pardon as to narcotic law violation would or would not affect deportability under section 241(a) (11) of the Immigration and Nationality Act.

In our judgment, a mere application for pardon does not require a stay of deportation. We agree with the opinion of the Court of Appeals in United States ex rel. Weddeke v. Watkins, 2 Cir., 166 F.2d 369, 373, wherein it was said: "Nor may we conclude that, under the circumstances of this case, the Immigration Service committed a legal error or abuse of discretion, after the warrant for deportation had been properly issued, in denying the alien's application for a stay of the warrant in order to enable him to apply to the Governor for a pardon or to bring some legal proceedings to reopen the judgment of conviction." See also Houvardas v. Wixon, 9 Cir., 169 F. 2d 980, where it was held that an alien, convicted, sentenced and imprisoned for crimes involving moral turpitude, to whom no pardon had been issued, was subject to deportation, notwithstanding the opportunity still existed for his application to appropriate state authorities for a pardon and delay in making such application was not his fault. Compare United States ex rel. Ullah v. Shaughnessy, D.C.N.Y., 87 F.Supp. 38, 40. There is no intimation in the record that appellant will receive a pardon, nor does any good reason appear why he should be pardoned. The record discloses that he might be termed a habitual criminal, inasmuch as he has been five times convicted of felonies upon guilty pleas.

Now, turning to the issue of whether appellant received fair hearings before the special inquiry officer of the Immigration and Naturalization Service and before the Board of Immigration Appeals, we should observe that, in any case in which an alien is ordered deported from the United States under applicable law, the decision of the Attorney General is made final. Section 1252(b) (4), Title 8 U.S.C.A.

In United States ex rel. Tisi v. Tod, 264 U.S. 131, 133, 134, 44 S.Ct. 260, 261, 68 L.Ed. 590, the Supreme Court affirmed the dismissal of a writ of habeas corpus in deportation proceedings against an alien. Mr. Justice Brandeis, in delivering the unanimous opinion of the court, pointed out that the alien had received due notice of the charge, was present in person and represented by counsel at the hearing; and that he testified fully and was given ample time to present his evidence, argument and brief. "Under these circumstances," the jurist said in concluding the opinion, "mere error, even if it consists in finding an essential fact without adequate supporting evidence, is not a denial of due process of law." In the body of the opinion, the Justice reasoned: "We do not discuss the evidence, because the correctness of the judgment of the lower court is not to be determined by enquiring whether the conclusion drawn by the Secretary of Labor from the evidence was correct, or by deciding whether the evidence was such that, if introduced in a court of law, it would be held legally sufficient to prove the fact found. The denial of a fair hearing is not established by proving merely that the decision was wrong. Chin Yow v. United States, 208 U.S. 8, 13, 28 S.Ct. 201, 52 L.Ed. 369. This is equally true whether the error consists in deciding wrongly that evidence introduced constituted legal evidence of the fact or in drawing a wrong inference from the evidence. The error of an administrative tribunal may, of course, be so flagrant as to convince a court that the hearing had was not a fair one. [Citing cases.] But here no hasty, arbitrary or unfair action on the part of any official, or any abuse of discretion, is shown."

The comment made in the last sentence is likewise appropriate in the instant case. The same eminent Supreme Court Justice, in affirming an order of the district court discharging a writ of habeas corpus and remanding the relator to the Commissioner of Immigration for deportation, stated, in discussing the review of deportation proceedings: "Moreover, a hearing granted does not cease to be fair, merely because rules of evidence and of procedure applicable in judicial proceedings have not been strictly followed by the executive; or because some evidence has been improperly rejected or received. [Citing cases.] To render a hearing unfair the defect, or the practice complained of, must have been such as might have led to a denial of justice, or there must have been absent one of the elements deemed essential to due process." United States ex rel. Bilokumsky v. Tod, 263 U.S. 149, 157, 44 S.Ct. 54, 57, 68 L.Ed. 221.

In Kessler v. Strecker, 307 U.S. 22, 34, 59 S.Ct. 694, 700, 83 L.Ed. 1082, Mr. Justice Roberts thus succinctly stated the principle: "If the hearing was fair, if there was evidence to support the finding of the Secretary [of Labor], and if no error of law was committed, the ruling of the Department must stand and cannot be corrected in judicial proceedings. If, on the other hand, one of the elements mentioned is lacking, the proceeding is void and must be set aside."

The opinions of two Courts of Appeals are also elucidating on the subject. Bridges v. Wixon, 9 Cir., 144 F.2d 927; and Kielema v. Crossman, 5 Cir., 103 F. 2d 292, 293. In the last cited case affirming an order discharging a writ of habeas corpus and remanding the relator to the custody of the Immigration Inspector for deportation, the court said: "The credibility of the witnesses and the weight of their testimony were for the immigration authorities. On habeas corpus, if the petitioner has been given a fair trial, the court will not disturb the findings of fact of the immigration authorities if such findings are supported by substantial evidence. There was substantial evidence to support the findings and deportation order [citing cases]."

We find nothing in the opinion of this court, written in 1923 by Judge Donahue in Chin Hoy v. United States, 6 Cir., 293 F. 750, to gainsay the foregoing principles declared by the Supreme Court

of the United States and the other authorities which have been cited. Upon these principles and upon the substantial evidence which has been reviewed, it follows that the order of deportation was properly upheld by the United States District Court, and the petition for writ of habeas corpus was rightly denied.

The judgment of the district court is affirmed.